IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Sandra A. R.,[1] | ) | C/A No.: 1:23-786-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Cameron McGowan Currie, United States District Judge, dated March 8, 2023, referring this matter for disposition. [ECF No. 6]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 5].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.      Relevant Background

        A.      Procedural History

On May 3, 2019, Plaintiff filed an application for DIB in which she alleged her disability began on April 19, 2019. Tr. at 369–75. Her application was denied initially and upon reconsideration. Tr. at 146–52, 154–59. Plaintiff had hearings by telephone before Administrative Law Judge ("ALJ") Gregory M. Wilson on August 16, 2021, January 13, 2022, and July 21, 2022. Tr. at 41–62, 63–74, 75–113 (Hr'g Tr.). The ALJ issued an unfavorable decision on August 17, 2022, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–33. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–7. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on February 27, 2023. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 58 years old at the time of the first hearing. Tr. at 86. She completed high school and some trade school. Tr. at 87. Her past relevant work ("PRW") was as a laboratory technician. Tr. at 108. She alleges she has been unable to work since April 19, 2019. Tr. at 369.

2.    Medical History

Plaintiff presented to Augusta Mental Health ("AMH") for an initial psychiatric evaluation on October 16, 2018. Tr. at 606–11. She reported a history of depressive symptoms since age 14 that included dysthymia, hopelessness, helplessness, suicidal ideation, fragmented sleep, mood swings, labile affect, and periods of anxiety. Tr. at 606. Hany Elia, M.D. ("Dr. Elia"), recorded normal findings on mental status exam ("MSE"), aside from ambivalent and depressed mood. Tr. at 608–10. He assessed moderate major depressive disorder ("MDD") and generalized anxiety disorder ("GAD"). Tr. at 610–11. He discontinued Prozac, prescribed Lexapro 10 mg with a plan to increase it in two weeks if Plaintiff failed to improve, and continued Gabapentin. Tr. at 611.

Plaintiff followed up at AMH for medication management and a comprehensive nursing assessment on November 20, 2018. Tr. at 587–99. Dr. Elia noted Plaintiff's Lexapro dose had been increased to 20 mg. Tr. at 613.

Plaintiff reported doing well on prescribed medication with improved depression. Tr. at 596. The nurse recorded normal findings on MSE. Tr. at 596–99.

Plaintiff reported neck pain and requested medication refills on February 27, 2019. Tr. at 627. Cynthia S. Murray, M.D. ("Dr. Murray"), assessed cervical neuralgia and continued Gabapentin 600 mg. Tr. at 628. She indicated Plaintiff was doing well on medication for anxiety and refilled Lexapro 20 mg. *Id.*

Plaintiff presented to the emergency room ("ER") at University Hospital on March 10, 2019. Tr. at 693. She indicated she had considered overdosing on pills following an argument with her husband. *Id.* Justin T. Geisler, M.D., observed depressed mood, suicidal ideation, and suicidal plans. Tr. at 695. He referred Plaintiff to Summit Ridge Hospital for inpatient care. Tr. at 698.

Plaintiff was hospitalized at Summit Ridge Hospital from March 11 to 15, 2019. Tr. at 753. She was diagnosed with severe bipolar disorder without psychosis and prescribed 10 mg of Lexapro and 150 mg of Trileptal in the morning and 300 mg of Trileptal in the evening. *Id.*

Plaintiff returned to University Hospital for suicidal ideation with a plan to overdose on March 19, 2019. Tr. at 704. Andrew White, M.D., noted

dysphoric mood and suicidal ideation on exam. Tr. at 706. He ordered that Plaintiff be transferred to a psychiatric facility for stabilization. Tr. at 708.

Plaintiff was hospitalized for suicidal ideation in the psychiatric unit at Peachford Hospital from March 20 to March 26, 2019. Tr. at 660. On admission, her appearance was disheveled, her mood was depressed and anxious, and her judgment and insight were significantly impaired. *Id.* At the time of discharge, she was calm, pleasant, and cooperative with no suicidal or homicidal ideation or auditory or visual hallucinations. Tr. at 661. The attending physician diagnosed MDD and prescribed Cymbalta 60 mg, Norvasc 5 mg, Zantac 150 mg, Trazodone 100 mg, and Neurontin 800 mg. *Id.*

Plaintiff presented to licensed professional counselor Mary Clarkson ("Counselor Clarkson") for a new patient evaluation on April 1, 2019. Tr. at 753–57. She reported Cymbalta had improved her mood, but Trazodone was ineffective and she was experiencing restless sleep. Tr. at 753. She indicated she had recently taken Klonopin and had smoked marijuana the prior day. Tr. at 754. Counselor Clarkson noted dysphoric mood and fair insight and judgment, but otherwise normal findings on MSE. Tr. at 755. She assessed recurrent MDD without psychotic features and indicate a need to rule out bipolar II disorder and borderline personality disorder. Tr. at 756. Physician assistant Stacia Fritz ("PA Fritz") continued Cymbalta 60 mg, discontinued Trazodone, and added Doxepin 25 mg for sleep. *Id.*

Plaintiff presented to physician assistant Julie Buird ("PA Buird") for acute anxiety on April 18, 2019. Tr. at 795. She described panic attacks characterized by chest tightness, feeling nervous, and inability to focus. *Id.* PA Buird assessed anxiety disorder and prescribed Klonopin 1 mg, twice a day as a needed for anxiety. Tr. at 797.

Plaintiff presented to the ER at University Hospital following an intentional overdose of Klonopin on April 21, 2019. Tr. at 715. Adam F. Hoover, M.D., observed Plaintiff to progress from initial lethargy to stupor with intermittent hypoxia, requiring Flumazenil to combat benzodiazepine overdose. Tr. at 717, 720. He indicated Plaintiff demonstrated slurred speech, slowed behavior, depressed mood, inattentiveness, and suicidal ideation and plan. Tr. at 718. He discharged Plaintiff to inpatient psychiatric hospitalization. Tr. at 721.

Plaintiff was hospitalized at Summit Ridge Hospital from April 22 to April 29, 2019. Tr. at 738–42. At the time of intake, Plaintiff stated she had taken two Benadryl to sleep, but she had actually taken Ritalin and Klonopin in a suicidal attempt. Tr. at 740. She indicated she had separated from her third husband and was living with her mother. *Id.* Mehmood Mehdi, M.D., diagnosed severe MDD without psychosis. Tr. at 742. At the time of discharge, Plaintiff denied suicidal and homicidal ideation and had fair judgment and insight. Tr. at 739.

Plaintiff followed up with PA Fritz on May 6, 2019. Tr. at 758–60. PA Fritz observed Plaintiff to demonstrate dysthymic mood with tearful affect, rapid speech, impaired attention, concentration, and perception, and fair insight and judgment. Tr. at 758, 760. She prescribed Abilify 5 mg, continued Trintellix 10 mg, and discontinued Trazodone, Cymbalta, and Doxepin. *Id.*

On May 24, 2019, Plaintiff reported feeling better, but continuing to sleep poorly and experience anxiety during the day. Tr. at 761. PA Fritz noted Plaintiff's mood was more euthymic for calm affect, but her speech was somewhat rapid and her insight and judgment were fair. Tr. at 763. She continued Abilify 5 mg and Trintellix 10 mg and prescribed Lunesta 2 mg and Gabapentin 600 mg. Tr. at 761.

Plaintiff complained of feeling overmedicated on June 18, 2019. Tr. at 764. She requested to be switched from Abilify back to Prozac. *Id.* PA Fritz recorded normal MSE findings, aside from rapid speech and fair insight and judgment. Tr. at 764, 766. She discontinued Abilify, prescribed Prozac 40 mg, and continued Gabapentin and Lunesta for sleep. Tr. at 764.

Plaintiff reported severe depression following the finalization of her divorce on July 16, 2019. Tr. at 767. She endorsed passive suicidal ideation over the prior month. *Id.* PA Fritz noted normal findings on MSE, aside from depressed mood with congruent affect and fair insight and judgment. Tr. at

767, 769. She increased Prozac to 40 mg twice a day and continued Lunesta and Gabapentin. Tr. at 767.

On July 31, 2019, state agency psychological consultant Patrice G. Solomon, Ph.D. ("Dr. Solomon"), reviewed the record and completed a psychiatric review technique ("PRT"). Tr. at 121–22. She considered Listing 12.04 for depressive, bipolar, and related disorders and assessed no difficulties in understanding, remembering, or applying information, mild difficulties in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. *Id.* She stated Plaintiff's symptoms "appear[ed] to be precipitated by situational crisis and should resolve with return to more normal [mental status exam]." Tr. at 122.

On September 22, 2019, state agency medical consultant Robert Mitgang, M.D. ("Dr. Mitgang"), reviewed the record and concluded the evidence did not establish a severe physical impairment. Tr. at 120.

PA Fritz completed a treating source statement on September 27, 2019. Tr. at 777–81. She stated she had started treating Plaintiff on April 1, 2019, and had diagnosed her with severe MDD with anxious distress. Tr. at 777. She described Plaintiff's prognosis as fair and noted she had been hospitalized multiple times for suicidal ideation. *Id.* She identified Plaintiff's signs and symptoms as: disturbance of mood accompanied by full or partial depressive syndrome; anhedonia or pervasive loss of interest in almost all

activities; appetite disturbance with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; motor tension; autonomic hyperactivity; apprehensive expectation; recurrent obsessions or compulsions that were a source of marked distress; perceptual or thinking disturbances; emotional lability and impairment in impulse control; and a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate. Tr. at 777–78. She stated Plaintiff was markedly limited in her abilities to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage oneself. Tr. at 779. She noted Plaintiff's short-term memory and abilities to remember locations and work-like procedures and to understand and carry out very short and simple instructions were moderately-limited and her abilities to understand and carry out detailed, but not involved, written or oral instructions was markedly limited. Tr. at 780. She considered Plaintiff able to maintain attention and concentration for 15 minutes before needing redirection or requiring a break. *Id.* She felt Plaintiff was sometimes, but not consistently, capable of working with the general public, coworkers, and supervisors. *Id.* She stated Plaintiff could sometimes, but not consistently,

maintain socially-appropriate behavior and respond appropriately to changes in work settings. Tr. at 781. She considered Plaintiff likely to be off-task for greater than 25% of a typical workday and absent from work on four or more days per month due to her impairments or treatment. *Id.*

Plaintiff presented to Leslie J. Pollard, M.D. ("Dr. Pollard"), as a new patient on January 7, 2020. Tr. at 908. She reported feeling down, irritable, and anxious and having a history of suicidal thoughts, although she denied current suicidal ideation. *Id.* She also endorsed neck pain and a history of hypertension. *Id.* She requested to change her medication to Trintellix. *Id.* Dr. Pollard recorded normal findings on physical exam. Tr. at 910. He prescribed Estradiol 1 mg, Amlodipine Besylate 5 mg, Atenolol 25 mg, and Trintellix 5 mg and advised Plaintiff to check her blood pressure two to three times a week, maintain a blood pressure log, follow a diet, exercise, and wean Prozac down to 40 mg daily. Tr. at 910–11.

On February 10, 2020, Plaintiff reported her medication was working better and she was not as irritable, moody, or cranky. Tr. at 896. She endorsed increased energy and fewer crying spells and mood swings. *Id.* Dr. Pollard recorded normal findings on physical exam. Tr. at 897–98. He encouraged diet and exercise, urged Plaintiff to check her blood pressure, and advised her to continue treatment with a psychiatrist. Tr. at 899.

A second state agency medical consultant, Delsadie Callins, M.D. ("Dr. Callins"), reviewed the record on March 22, 2020, and concluded Plaintiff's physical impairments remained non-severe. Tr. at 134–35.

On May 10, 2020, Plaintiff complained of sharp bilateral leg pain and swelling that moderately limited her activities. Tr. at 813. She reported her job required a lot of standing and walking and her symptoms were worse after she worked an eight-hour shift. *Id.* Nurse practitioner William Meek noted non-pitting edema to the bilateral legs and diffuse swelling in the bilateral lower extremities. Tr. at 814–15. He assessed dependent edema and arthritis of both ankles and prescribed Diclofenac Sodium 75 mg. Tr. at 815.

Plaintiff complained of muscle and joint pain and some ankle swelling on May 14, 2020. Tr. at 880. Dr. Pollard observed edema, but no other abnormal findings on exam. Tr. at 881–82.

Plaintiff presented to James H. Way, Ph.D. ("Dr. Way"), for a consultative MSE on September 15, 2020. Tr. at 784–87. She reported living with her brother in a "shed" with no electricity. Tr. at 784. She indicated her mood was a "rollercoaster" and she had recently experienced "thoughts that she would be better off dead." Tr. at 785. She endorsed sleep disturbance, irritability, worthlessness, and ability to concentrate only on very simple tasks. Tr. at 785–86. She also indicated she had a history of fixating on certain cognitions and experiencing excessive worry and anxiety. Tr. at 786.

11

She reported working 24 hours per week at Goodwill, watching television, completing self-care tasks independently, managing her medications, shopping independently, microwaving food, performing household chores, and managing funds independently. *Id.*

Dr. Way noted Plaintiff had difficulty remaining on topic and provided a poor description during questioning as to her psychiatric history. *Id.* He recorded normal findings on MSE, aside from depressed mood, labile affect with tearfulness, at times, and impaired attention/concentration. Tr. at 786–87. He noted Plaintiff provided accurate responses to two items measuring abstract reasoning skills and was able to recall three of three words immediately and one of three after a five-minute delay, identify items presented to her, correctly repeat a phrase, and read and follow a simple command, but was unable to complete serial sevens accurately and spell "world" backwards. Tr. at 787. He stated Plaintiff was "intellectually capable" of completing basic self-care and activities of daily living ("ADLs"), but it was "likely that her psychiatric symptoms, which ha[d] been severe over at least the past year, would result in inconsistent functioning" with ADLs. *Id.* He noted Plaintiff's social functioning was "likely to be impaired" based on evidence that "she [was] easily overwhelmed" and "exhibit[ed] emotional lability." *Id.* He further explained:

> The claimant is likely to experience significant deficits in each of the aforementioned areas, at least at intervals, given her

> psychiatric symptom picture. She is likely to have difficulty managing typical job stressors. She is likely to experience poor occupational functioning at times secondary to psychiatric symptoms. She is intellectually capable of learning a wide range of simple and moderately complex tasks. She is able to follow instructions. At the current time, she will likely require assistance with making appropriate adjustments and decisions in an occupational setting.

*Id.* His diagnostic impressions were severe, recurrent MDD, rule out history of obsessive-compulsive disorder ("OCD"), hypertension, and fibromyalgia (by claimant report only). *Id.*

On September 30, 2020, state agency psychological consultant Derek O'Brien, M.D. ("Dr. O'Brien"), reviewed the record, completed a PRT, and considered Listing 12.04. Tr. at 136–38. He assessed no difficulties in understanding, remembering, or applying information, mild difficulties in interacting with others, and moderate difficulties in concentrating, persisting, or maintaining pace and adapting or managing oneself. *Id.* He completed a mental residual functional capacity ("RFC") assessment and noted Plaintiff was moderately limited as to the following abilities: to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in work setting. Tr. at 139–41.

13

Plaintiff presented to the ER at Doctors Hospital on November 3, 2020, with complaints of chest and back pain following a car accident the prior day. Tr. at 826. Physician assistant Megan Keller ("PA Keller") noted lumbar and thoracic spinal and paraspinal tenderness. Tr. at 829. X-rays of Plaintiff's chest and lumbar spine showed no acute abnormalities. *Id.* PA Keller assessed back and chest wall pain and prescribed ibuprofen 800 mg, Lidoderm patches, Robaxin 750 mg, and Diazepam 5 mg. Tr. at 831.

Plaintiff followed up at Evans Sport & Spine for intense low- and mid-back pain on November 6, 2020. Tr. at 855. She rated her pain as an eight out of 10 and indicated it was exacerbated by activity and lying on her back. *Id.* She described constant bilateral lower lumbar aching, burning, dull, and throbbing pain that radiated into her right lateral thigh and stopped at the knee and accompanying stiffness and numbness/tingling. Tr. at 856. Chiropractor Jason Rueggeberg noted muscle spasm and tenderness in the lumbar spine and paraspinal muscles, 33% loss of range of motion ("ROM") of the lumbar spine, positive straight-leg raise ("SLR") on the right, 5/5 motor strength, normal reflexes, and hypoesthesia at L2 on the right. Tr. at 856–57. Plaintiff returned for visits on November 9, 11, 12, 13, 16, and 18. Tr. at 840–54, 860–62.

On November 17, 2020, an MRI of Plaintiff's lumbar spine showed moderate-to-advanced degenerative disc disease ("DDD") at multiple lumbar

and lower thoracic disc levels; a mild-to-moderate dextroscoliosis of the thoracolumbar spine; disc bulges superimposed on spondylosis at multiple levels, including L3–4, L4–5, and L5–S1; and lateral recess and foraminal stenosis at L3–4, L4–5, and L5–S1. Tr. at 789–90.

Plaintiff presented to Charles S. Watras, M.D. ("Dr. Watras"), as a new patient on February 24, 2021. Tr. at 928. She reported a history of suicide attempts and requested a referral to a psychiatrist. *Id.* She indicated she had experienced back pain following a car accident in November 2020. *Id.* Dr. Watras indicated normal findings on physical exam, except for depressed mood. Tr. at 929–30. He decreased Atenolol from 50 mg to 25 mg, prescribed Amlodipine 5 mg and Venlafaxine 100 mg, and ordered lab studies and a mammogram. Tr. at 930.

Plaintiff presented to Dr. Watras for right abdominal pain on March 31, 2021. Tr. at 791. Dr. Watras assessed lumbago-sciatica due to displacement of intervertebral disc and prescribed Pregabalin 25 mg. *Id.*

On July 12, 2021, Plaintiff reported Lyrica helped with her back pain, but caused constipation. Tr. at 926. Dr. Watras recorded normal findings on physical exam, aside from limited ROM and pain in the neck and lower back. Tr. at 926–27. He assessed idiopathic peripheral neuropathy and irritable bowel syndrome, recommended a high-fiber diet and a cervical pillow, and prescribed Pregabalin 100 mg. Tr. at 927.

On October 4, 2021, Dr. Watras noted limited ROM and neck and back pain and lumbar stenosis. Tr. at 944. He prescribed medication for seasonal allergies and hormone replacement. *Id.*

Plaintiff complained of back pain on November 30, 2021. Tr. at 945. She indicated the pain had begun about two weeks prior and limited her mobility. *Id.* She denied numbness or weakness and expressed a desire to pursue physical therapy and possibly increase her Pregabalin dose. Tr. at 946. Dr. Watras noted limited ROM of the spine, lower back pain on the left posterior side and in the coccyx area, lumbar facet arthropathy, and abnormal sensation around the coccyx area. Tr. at 947. He increased Pregabalin to 225 mg, one to two tablets in the evening, and instructed Plaintiff to titrate up the dose over several days. *Id.*

Plaintiff complained of abdominal pain and constipation on December 15, 2021. Tr. at 949. Dr. Watras noted limited ROM of the spine, lower back pain in the left posterior side, coccyx area, and left sacroiliac joint, lumbar facet arthropathy, and abnormal sensation around the coccyx area. Tr. at 951. He instructed Plaintiff to try high-fiber Citrucel, increased Pregabalin to 450 mg, and referred Plaintiff to a pain management provider for possible injections. *Id.*

Plaintiff presented to Travis Hecker, M.D. ("Dr. Hecker"), for a pain management consultation on December 28, 2021. Tr. at 955. She described

chronic non-radiating low-back pain that increased upon changing positions, standing, walking, and sitting. *Id.* Dr. Hecker noted mostly normal findings on exam, including intact judgment and insight, normal mood and affect, 5/5 strength in the lower extremities, full interior and exterior hip rotation, symmetrical distal pulses, negative dural tension, tenderness to palpation in the mid-gluteal and coccyx tip, and concordant pain. Tr. at 955–56. He assessed chronic pain in the coccyx and sacrococcygeal disorders, not otherwise classified. Tr. at 956. He prescribed Tizanidine 4 mg, referred Plaintiff to physical therapy, and ordered a ganglion impar injection. Tr. at 956.

Plaintiff presented to James P. Walton, M.D. ("Dr. Walton"), to establish care on April 12, 2022. Tr. at 963. She reported chronic low-back pain and a herniated disc in her neck, but denied neuropathic pain in her extremities, bowel/bladder dysfunction, numbness, tingling, and weakness. Tr. at 966. She also endorsed a two-month history of right hip pain that was worsened by weight-bearing. *Id.* She reported a history of MDD with stabilizing acute depression due to changes associated with her recent move. *Id.* Dr. Walton recorded normal finding on physical exam. *Id.* He prescribed Venlafaxine ER 150 mg and Pregabalin 225 mg and referred Plaintiff to a pain management provider for possible injection treatment. *Id.*

Plaintiff complained of back and right leg pain and numbness and tingling on July 1, 2022. Tr. at 987. She described worsening right leg pain and weakness upon attempting to stand, after having engaged in lifting on the prior day. *Id.* She noted pain in her back and into her right groin had been improving with physical therapy until the prior day. *Id.* Clinical physician assistant Megan Shiver ("PA Shiver") noted Plaintiff was tearful during the interview, but had no musculoskeletal abnormalities. Tr. at 988. She assessed lumbar radiculopathy, prescribed a Medrol Dosepak, and ordered an MRI of Plaintiff's lumbar spine. *Id.*

Plaintiff presented to the ER at Doctors Hospital for back pain on July 6, 2022. Tr. at 993. She described chronic right-sided low-back pain that had worsened over the prior week, after she underwent a colonoscopy and performed yard work. *Id.* She indicated she had completed a course of steroids the prior day and felt worsening pain with spasms traveling down her right leg. *Id.* Physician assistant Melissa Williamson ("PA Williamson") noted right gluteal tenderness, swelling and tenderness in the bilateral hips, and reduced ROM in the right hip. Tr. at 994–95. She ordered a muscle relaxer and a steroid injection, and Plaintiff reported improvement. Tr. at 996. PA Williamson discharged Plaintiff with a prescription for Robaxin 500 mg and instructed her to follow up with her primary care physician. Tr. at 997.

C.    The Administrative Proceedings

    1.    The Administrative Hearings

        a.    Plaintiff's Testimony

            i.    August 16, 2021

Plaintiff testified she lived alone. Tr. at 87. She said she had been working for Home Instead for six months, earning $10 an hour and working 20 hours per week. *Id.* She described the job as sitting with elderly people, doing a little bit of cleaning, preparing their meals, and reminding them to take their medications. *Id.* She stated she had previously worked at Walmart as a self-checkout cashier for a couple of weeks. Tr. at 87–88. She indicated that before Walmart, she had worked about 26 hours a week for Goodwill, where she priced items and put them on the sales floor. Tr. at 88. She said she earned $8.50 per hour in that position. *Id.* She explained that she left the job at Goodwill because she moved to her sister's home in a different area. Tr. at 88–89. She confirmed that she had filed for unemployment benefits when she was fired from her previous job, but the benefits had been denied because she had failed to call in sick while she was hospitalized. Tr. at 89.

Plaintiff stated she experienced daily pain in the middle of her back that radiated to her hips. Tr. at 89–90. She testified her pain varied based on her activity. Tr. at 90. She said vacuuming and cleaning the bathtubs increased her pain. *Id.* She indicated she could comfortably lift about 20

19

pounds and explained that during a trip to Florida, she felt pretty sore after holding her 15-pound grandchild for a long period. Tr. at 90–91.

Plaintiff testified she had difficulty performing full-time work because she felt anxious when "things g[ot] really busy" and she could not perform her tasks correctly. Tr. at 91. She stated she lost concentration and felt obsessive and depressed. *Id.* She stated her depressive symptoms would decline rapidly to a point where she felt like she wanted to die. *Id.*

Plaintiff confirmed that she had last worked full-time at a dental studio. Tr. at 92. She said she had difficulty learning new things in her workplace. *Id.* She explained that her attitude had "got[ten] bad" and she had "got mean," which was uncharacteristic of her. *Id.* She stated she felt worthless, messed up her work, cut herself on the handpiece, could not focus, and could not finish her work tasks. Tr. at 93. She indicated her prescribed medication had not been working and she had decided to "end it" in March 2019. *Id.*

Plaintiff explained that her depressive symptoms were triggered by watching the news on television, speaking with her ex-husband, thinking about her children's past problems, considering her father's suicide, and going to visit her mother because her stepfather had Alzheimer's and it was "a mess there." Tr. at 94. She said she had to quit working with a former client because she was unable to turn her due to back pain and could not deal

with her negativity. Tr. at 94–95. She indicated she did not believe she could work full-time because any full-time job would require her to "push" herself and trigger her anxiety, OCD, and inability to focus. Tr. at 95. She said any type of stress brought on her symptoms. Tr. at 96. She stated she had been overwhelmed by the job as a self-checkout cashier at Walmart because she could not adjust to different procedures. *Id.*

Plaintiff confirmed that her current medications effectively treated her anxiety and depression as long as she engaged in self-care and did not "push" herself. Tr. at 97. She stated she felt that her medications interfered with her focus and concentration. *Id.*

Plaintiff testified her family doctor had been treating her back problems. Tr. at 97–98. She indicated her doctor had prescribed Pregabalin for her back and neck. Tr. at 98, 99. She said she had undergone prior neck surgery, but denied having participated in physical therapy or having received injections for her back. Tr. at 98. She said she had first noticed the back pain when she was working for Goodwill in 2019. *Id.* She indicated she had undergone neck surgery 15 years prior and had been informed seven years prior that the discs above and below the surgical area were "shot." Tr. at 99.

Plaintiff admitted she had cooked, washed dishes, done laundry, folded clothes, swept, mopped, dusted, taken out the trash, cleaned the bathroom,

kitchen, and living room, pulled weeds, used a weed eater, and driven for as long as four hours at a time over the prior two-year period. Tr. at 100–02. She said she had attended church on five Sundays over the prior two months. Tr. at 102. She indicated she used text, rarely used email, and did research on the internet. Tr. at 103. She stated she read, watched movies, visited stores, and went out to eat. *Id.*

Plaintiff confirmed that she worked for a dentist from 2007 until 2017. Tr. at 105. She stated she had the same job duties over the entire period. *Id.* She specified her job required she disinfect and pour stone into impressions, take impressions out of the stone, trim the impressions on a model trimmer, put pins in the bottom of the impressions, put the impressions in vases, and articulate them. Tr. at 105–06. She stated she had previously worked as a dental assistant, but denied having done so over the prior 15 years. Tr. at 106.

### ii.    January 13, 2022

Plaintiff briefly testified at the second hearing. Tr. at 71. She stated she had personally tried to get in touch with PA Fritz to obtain additional records, but PA Fritz had moved from the area, and she did not know how to go about getting her records. *Id.* She agreed to complete a medical authorization for the ALJ to request PA Fritz's records. *Id.*

### iii.    July 21, 2022

Plaintiff testified she continued to work for the same company she had worked for at the time of the first hearing, but in a different location. Tr. at 51–52. She stated her job duties varied, as different clients had different levels of mobility. Tr. at 52. She said she often cooked, did her clients' laundry, picked up items for them from the grocery store, and ran errands for them. *Id.* She indicated she worked three four-hour shifts one week and two four-hour shifts and one six-hour shift the following week. *Id.* She said she was paid $13 per hour. *Id.* She stated her employer would likely offer her more hours if she were able to work more hours. *Id.*

Plaintiff explained that she had recently experienced a problem with her leg while she was shopping for groceries. Tr. at 52–53. She said she had visited her family doctor, who told her it sounded like she had a pinched nerve. Tr. at 53. She stated her doctor had prescribed Prednisone, but it had not helped. *Id.* She said her pain had increased a couple of days after she finished the Prednisone, prompting her to visit the emergency room for a Cortisone injection and muscle relaxers. *Id.* She indicated she was scheduled for an appointment with a specialist on August 15 and expected to be sent for a repeat MRI. *Id.*

Plaintiff testified she had moved from her sister's vacation home in North Carolina to her son's home in Georgia because her son was expecting a

new baby and asked her to come and stay with his family. Tr. at 53. She said her son had subsequently moved in with his father, and she had moved to a travel trailer on her brother's property. Tr. at 53–54. She confirmed that she had been babysitting her son's four-year-old daughter from January to June. Tr. at 54, 56. She said she prepared her granddaughter's lunch, read to her, and watched her while her parents were at work. Tr. at 54.

Plaintiff stated her employer had offered her more clients, but she had been reluctant to take them on because of her back problem and the risk that they might fall. Tr. at 54–55. She said she would typically go home and rest after completing a shift. Tr. at 55. She indicated she would be unable to work an eight-hour shift because of her back problems. Tr. at 56.

Plaintiff testified her doctor had recommended she see a pain management specialist, but she had been unable to find one locally who was in her network. Tr. at 56–57. She said she had attended physical therapy for three or four weeks before her pain increased. Tr. at 57. She stated it had become painful for her to walk. *Id.* She explained that she could walk for variable periods, and her ability to walk depended on whether or not she was experiencing muscle spasms. Tr. at 57–58. She said she had good and bad days with her pain, and the days she was working tended to be bad days. Tr. at 58.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Melissa Neel reviewed the record and testified at the hearing on August 16, 2021. Tr. at 104–12. The ALJ asked the VE to specifically categorize Plaintiff's prior work in the dental profession, as well as the jobs she had performed since 2019. Tr. at 108. The VE categorized Plaintiff's prior jobs as a laboratory technician, *Dictionary of Occupational Titles* ("*DOT*") No. 712.381-018, requiring light exertion and a specific vocational preparation ("SVP") of 7; a companion, *DOT* No. 309.677-010, requiring light exertion per the *DOT* and medium exertion as performed and an SVP of 3; and a laborer, *DOT* No. 922.687-058, requiring medium exertion and an SVP of 2. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work with the following restrictions: lift 50 pounds occasionally and 25 pounds frequently; stand for six out of eight hours; walk for six out of eight hours; sit for six out of eight hours; occasionally climb ladders, ropes, or scaffolds; frequently climb ramps and stairs, stoop, and crouch; frequently reach overhead; no more than occasional exposure to vibration; perform simple and detailed work requiring frequent judgment, occasional decision-making, and a reasoning level up to and including three; perform on a sustained basis, eight hours a day, five days a week in two-hour increments with normal breaks for an eight-hour workday; and perform in a low-stress environment involving no fast-paced, assembly-

line type work. Tr. at 108–09. He asked if the individual would be able to perform Plaintiff's PRW as actually performed or as generally performed in the national economy. Tr. at 109. The VE testified the individual would be able to perform work as a companion. *Id.* She stated the job of laborer would not be available based on the occasional requirement to climb ladders. *Id.* The ALJ asked the VE if there would be other work available to such an individual. *Id.* The VE identified jobs at the medium exertional level as a cleaner, *DOT* No. 919.687-014, a landscape specialist, *DOT* No. 406.687-018, and a day worker, *DOT* No. 301.687-014, with 55,000, 40,000, and 70,000 positions in the national economy, respectively. Tr. at 110.

The ALJ asked the VE if her testimony had been consistent with the *DOT* in accordance with SSR 00-4p. *Id.* The VE stated it had. *Id.*

As a second hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who could lift 20 pounds occasionally and 10 pounds frequently and would otherwise be limited as described in the prior question. *Id.* He asked if such an individual would be able to perform Plaintiff's PRW. *Id.* The VE testified the individual would be able to work as a companion as generally described. Tr. at 111.

As a third hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile and to consider that she would have absences from the workstation on a daily basis, the duration of which would

be at her sole discretion. *Id.* He asked if that would affect the VE's answer to the prior question. *Id.* The VE stated there would be no work for such an individual. Tr. at 112.

### 2.    The ALJ's Findings

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2026.
2. The claimant has not engaged in substantial gainful activity since April 19, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*).
3. The claimant has the following severe impairments: depressive disorder, generalized anxiety disorder, degenerative disc disease of the cervical and lumbar spine, and obesity (20 CFR 404.1520(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).
5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except she can occasionally climb ladder, ropes, and scaffolds. She can frequently climb ramps and stairs, stoop, and crouch. The claimant is able to frequently reach overhead and can have occasional exposure to vibration. The claimant can perform simple and detailed work with occasional decision-making required and frequent judgment required. She can perform work on a sustained basis eight hours per day five days per week, in two hour increments and with normal breaks in an eight-hour workday. She requires a low-stress work environment, defined as no fast-paced work where one would be required to produce in a high-speed manner.
6. The claimant is capable of performing past relevant work as a companion (DOT Code 309.677-010, semi-skilled, light work, with an SVP of 3, performed at the medium level). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

> 7.   The claimant has not been under a disability, as defined in the Social Security Act, from April 19, 2019, through the date of this decision (20 CFR 404.1520(f)).

Tr. at 14–25.

## II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

> 1)   the ALJ erred in finding Plaintiff could perform her PRW as a companion, despite having found the same work was not substantial gainful activity ("SGA"); and

> 2)   the ALJ erred in concluding Plaintiff could perform work at the medium exertional level based on her performance of two jobs at the medium exertional level after her alleged onset date ("AOD") even though those jobs were not SGA.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A.   Legal Framework

#### 1.   The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65

(4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

    2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is

rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

### B.    Analysis

#### 1.    Ability to Perform PRW

Plaintiff argues the ALJ erred in concluding she could perform her PRW as a companion despite having found this work was not performed at the SGA level. [ECF No. 11 at 3–5]. She notes the ALJ specifically found she had not engaged in SGA since her AOD of April 19, 2019, and the evidence showed she had worked as a companion beginning in January 2021, and was continuing to work in such a capacity at the time of the July 2022 hearing. *Id.* at 4. She further maintains her earnings as a companion were well-below the earnings threshold for SGA. *Id.*

The Commissioner argues the ALJ not only concluded Plaintiff could return to her PRW as a companion, but also proceeded to step five and identified other jobs she could perform that existed in significant numbers in the economy. [ECF No. 12 at 5–6]. She contends remand is not required because Plaintiff has offered no evidence to refute the ALJ's step five finding. *Id.* at 6.

The Social Security Administration ("SSA") "consider[s] that [a claimant's] work experience applies [i.e., is relevant] when it was done within the last 15 years, lasted long enough for [her] to learn to do it, and was substantial gainful activity." 20 C.F.R. § 404.1565(a). SGA "is work that is both substantial and gainful." 20 C.F.R. § 404.1572. A claimant's work activity "may be substantial even if it is done on a part-time basis or if [she] does less, get[s] paid less, or ha[s] less responsibility than when [she] worked before." 20 C.F.R. § 404.1572(a). "Gainful work is work that [the claimant] do[es] for pay or profit." 20 C.F.R. § 404.1572(b). Absent evidence that a claimant's earnings were subsidized, the SSA considers a claimant to be engaging in gainful activity if her earnings rise above the threshold amounts in earnings guidelines. *See* 20 C.F.R. § 404.1574(b). A claimant will be found "not disabled" at step four if her RFC allows her to meet the physical and mental demands of PRW as actually performed or as described by the *DOT* as customarily performed throughout the economy. SSR 82-62, at *1.

At step four, the ALJ found Plaintiff "was capable of performing past relevant work as a companion (*DOT* Code 309.677-010, semi-skilled, light work, with an SVP of 3, performed at the medium level)." Tr. at 24.

The ALJ erred in characterizing Plaintiff's work as a companion as PRW because it was not both substantial and gainful as defined in the regulations. Earlier in the decision, the ALJ acknowledged that Plaintiff's

work after her AOD "did not rise to the level of substantial gainful activity."

Tr. at 14. He explained:

> At the hearing, the claimant testified that she is currently working for Home Instead as a companion for elderly people for 12–18 hours per week, earning $13.00 per hour. Her earnings record documents earnings of $1,447 in the first quarter of 2022 (11D/1). The claimant's earnings record documents earnings of $321 from employment at Walmart in the first quarter of 2021 (11D/1). The claimant's earnings record documents earnings from Goodwill Industries in the second, third, and fourth quarters of 2020, of $1,241, $2,805, and $1,663, respectively (11D/1). The claimant's earnings record documents earnings from Goodwill Industries in 2019 as follows: $2,401 in the second quarter, $238 in the third quarter, and $2,436 in the fourth quarter (7D/1–2). A presumption is made that an individual is engaged in substantial gainful activity if monthly earnings averaged $1,220 per month in 2019, $1,260 per month in 2020, $1,310 per month in 2021, and $1,350 per month in 2022. The claimant's earnings do not meet the minimum to be considered substantial gainful activity.

*Id.*

The record supports the ALJ's finding at step one that Plaintiff's work after her AOD as a laborer and a companion was not SGA. Because 20 C.F.R. § 404.1565(a) only allows an adjudicator to consider as a vocational factor work a claimant performed within the last 15 years that was SGA, the ALJ erred in considering Plaintiff's work as a companion at step four.

If a claimant is unable to perform her PRW, the evaluation proceeds to step five and the ALJ considers whether the claimant's RFC allows her to perform other work available in the economy, given her age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). "[T]he Commissioner bears

the burden to prove [the claimant] can perform alternative work." *Pearson v. Colvin*, 810 F.3d 140 (4th Cir. 2019), citing *Bowen v. Yukert*, 482 U.S. 137, 146 n.5 (1987). "Work exists in the national economy where there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b).

Although the ALJ erred in concluding Plaintiff's work as a companion served as PRW at step four, he made "alternative findings for step five to the sequential evaluation process" that Plaintiff's RFC would allow her to perform jobs at the medium exertional level as a cleaner, *DOT* No. 919.687-014, a landscape specialist, *DOT* No. 406.687-010, and a day worker, *DOT* No. 301.687-014, and that such jobs existed in significant numbers in the national economy. Tr. at 24–25.

Plaintiff presents no specific step five challenge, as she does not argue the identified jobs were inconsistent with the RFC assessment, the VE's testimony was inconsistent with the information in the *DOT*, or the identified jobs failed to exist in significant numbers in the economy.[4]

The undersigned finds the ALJ's step four error harmless in light of his alternative step five finding. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th

---

[4] Plaintiff separately challenges the ALJ finding that she had a maximum RFC for medium work, and the court considers that argument separately below.

Cir. 1994) (Hall, J., concurring) (indicating it is proper for the court to affirm where "the ALJ conducted the proper analysis in a comprehensive fashion and cited substantial evidence to support his finding" because "there is no question but that he would have reached the same result notwithstanding his initial error").

The regulations allow for an "[e]xpedited process," whereby an ALJ may disregard a claimant's PRW and proceed to the fifth step of the evaluation process. *See* 20 C.F.R. § 404.1520(h). "If we find that you can adjust to other work based solely on your age, education, and the same residual functional capacity assessment we made under paragraph (e) of this section, we will find that you are not disabled and will not make a finding about whether you can do your past relevant work at the fourth step." *Id.* The expedited process effectively renders the step four finding inconsequential, allowing the court to disregard the ALJ's erroneous step four finding and consider his step five finding.

Because Plaintiff has identified no specific error in the ALJ's step five finding, the undersigned finds the ALJ met the Commissioner's burden to show there were jobs in significant numbers in the national economy that Plaintiff could perform.

2.    Reliance on Work Performed After AOD as Supporting
      Exertional Capacity for Medium Work

Plaintiff argues the ALJ erroneously concluded she had the RFC to perform work at the medium exertional level based on an incorrect assumption that work she performed as a companion and a laborer was SGA. [ECF No. 11 at 5–8]. She maintains the November 2020 lumbar MRI supports greater restrictions than those indicated by the state agency consultant, who reviewed the case prior to the MRI and recommended a consultative exam. *Id.* at 7. She asserts Medical-Vocational Rule 202.06 would support a finding of "disabled" if the ALJ had found she had a maximum RFC for unskilled, light work. *Id.* at 7. She emphasizes that the ALJ labeled as "persuasive" her "substantial gainful activity after the onset date" in concluding she could perform at the medium exertional level. [ECF No. 13 at 2–3]. She argues this shows the ALJ placed greater emphasis on his erroneous conclusion as to her PRW than the other evidence in assessing her RFC. *Id.* She claims the ALJ discussed her ADLs with respect to the postural and environmental limitations in the RFC assessment and did not specifically consider such evidence in addressing her exertional capacity. *Id.* at 4.

The Commissioner argues substantial evidence supports the ALJ's RFC assessment. [ECF No. 12 at 6–10]. She concedes the ALJ erroneously referred to Plaintiff's PRW as a companion and laborer as SGA, but appropriately

relied on it in considering her ADLs. *Id.* at 7. She asserts the ALJ also relied on additional evidence to support the RFC assessment, including the objective medical evidence, Plaintiff's limited medical treatment, the effectiveness of her medications, physical exams showing few abnormalities, and MSEs showing intact memory, normal mood and affect, and good judgment. *Id.* at 8–9. She notes that, in addition to Plaintiff's work activity, the ALJ referenced ADLs that included handling personal care activities and babysitting her four-year-old grandchild for several months over the relevant period. *Id.* She further maintains the ALJ focused on the tasks performed in Plaintiff's work as a companion and laborer, as opposed to whether the jobs qualified as SGA. *Id.* at 8–10. She claims Plaintiff relies only on speculation that the state agency consultant would have assessed a more restrictive RFC if they had evaluated her RFC after reviewing the MRI results, and points to no specific evidence that refutes the ALJ's RFC assessment. *Id.* at 10.

The RFC assessment must be based on all the relevant evidence in the case record. SSR 96-8p, 1996 WL 374184, at *2. Such evidence includes the claimant's medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of ADLs; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain,

that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *Id.* at \*5. The ALJ must include a narrative discussion referencing medical and non-medical evidence and explaining the restrictions included in the RFC assessment. *Id.* at \*7.

The ALJ must specifically address the claimant's allegations as to the effect of symptoms, including pain, in evaluating her RFC and must provide specific reasons for rejecting any of the claimant's alleged symptoms that might reasonably be caused by her medically-determinable impairments. *Id.*; *see also Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (explaining the ALJ is to engage in a two-step analysis when considering a claimant's alleged symptoms: "[f]irst . . . look[ing] for objective medical evidence showing a condition that could reasonably produce the alleged symptoms" and "[i]f [he] concludes the impairment could reasonably produce the symptoms the claimant alleges, [he] is to proceed to the second step, which requires [him] to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities"); 20 C.F.R. § 404.1529(b), (c). He is required to consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence," which includes her history, the signs and

laboratory findings, statements from her medical sources or other persons about how her symptoms affect her, her ADLs, the location, duration, frequency, and intensity of her symptoms, factors that precipitate and aggravate her symptoms, the type, dosage, effectiveness, and side effects of her medications, treatment and measures she has pursued for relief of symptoms, and any other evidence as to her functional limitations. *See* 20 C.F.R. § 404.1529(c); *see also* SSR 16-3p.

"[A] proper RFC analysis has three components: (1) evidence; (2) logical explanation; and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). The logical explanation should reflect how the ALJ weighed the evidence and arrived at the RFC finding. *Id.* "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (citing *Cichocki v. Astrue*, 729 F.3d 177 (2d Cir. 2013)).

The ALJ addressed the physical component of Plaintiff's RFC assessment as follows:

> To account for the claimant's degenerative disc disease and obesity,[5] she is limited to medium work except she can

---

[5] The ALJ referenced a July 2022 treatment note recording a weight of 250 pounds and a body mass index ("BMI") of 47.2 kg/m.[2] *See* Tr. at 20 (referencing 26F/7 (corresponding to Tr. at 985)), but the record suggests the

occasionally climb ladders, ropes, and scaffolds. She can frequently climb ramps and stairs, stoop, and crouch. The claimant is able to frequently reach overhead and can have occasional exposure to vibration.

Tr. at 20. He found Plaintiff could perform the work described in the RFC assessment "on a sustained basis eight hours per day five days per week, in two hour increments and with normal breaks in an eight-hour workday." Tr. at 17. Thus, he concluded Plaintiff could perform this work on a regular and continuing basis.

The ALJ explained: "This residual functional capacity is supported by the claimant's ability to work for Goodwill performing medium work, stocking and pricing items. It is also partially supported by the claimant's work as a home healthcare aide, which was classified as light work, but performed at the medium level." Tr. at 21. He further noted:

> I find the combined effects of all of the claimant's impairments create synergies necessitating a more restrictive residual functional capacity than if considering the impairments individually accordingly, the claimant was limited to lifting 50 pounds occasionally, 25 pounds frequently and standing, walking[,] and sitting six of eight hours each. In concluding the claimant could perform work at the medium level I was persuaded based on the claimant's substantial gainful activity after the onset date. The vocational expert testified that the claimant's work activity with goodwill was at the medium level and an SVP of two. Additionally, the vocational expert testified

weight indicated in this treatment note was a typo. During a visit on April 12, 2022, Plaintiff's weight was recorded as 25 pounds and her BMI was indicated to be 4.7 kg/m.$^2$ This also appears to be an error. Most of the records document Plaintiff's weight as ranging from 122 to 130 pounds and her BMI as ranging from 23.1 to 24.4 kg/m,$^2$ which falls within the normal range.

that the claimant was working as a companion which is an SVP of three and performed at the medium level. Based on the combined effects of the claimant's lumbar spine, cervical spine and obesity I limited the claimant to occasional exposure to ropes, ladders, scaffolds, vibration, frequent exposure to ramps, stairs, stooping and crouching. Again, at the sake of being redundant these activities are consistent with the work activity performed by the claimant since the onset date. In addition, the claimant testified to activities of daily living that included cooking, doing dishes, doing laundry, folding clothes, sweeping, mopping, vacuuming, taking the trash out, dusting, cleaning the bathroom, clean[ing] the kitchen and living room, doing some weed eating and pulling weeds, driving, driving to Florida, attending religious services and going out to get something to eat. The above enumerated activities of daily living require postural and environmental limitations set forth in the above residual functional capacity. Activities like doing laundry, sweeping, mopping, vacuuming, and cleaning the bathroom illustrate functional abilities in stooping, crouching, climbing set forth in the above residual functional capacity. The claimant was limited to frequent overhead lifting because of the cervical impairment.

*Id.*

As discussed earlier, the ALJ erred in finding Plaintiff's work as a companion and a store laborer was SGA because the work was not both substantial and gainful, as required to meet the statutory definition of SGA. However, the ALJ did not err in considering Plaintiff's work activity after the AOD because it was among the evidence relevant to her claim. Although the ALJ characterized this work as SGA at step four and indicated he was persuaded by it in finding Plaintiff could perform work at the medium exertional level, a review of the decision as a whole reflects his realization that the work was neither gainful nor performed on a full-time basis. *See* Tr.

at 14 (noting Plaintiff's testimony that she worked for 12–18 hours per week in her current position and earned $13.00 per hour, setting forth her earnings over the relevant period, and recognizing "[t]he claimant's earnings do not meet the minimum to be considered substantial gainful activity."); Tr. at 18–19 (noting Plaintiff testified to "working 12–18 hours per week" in her current position as a companion and "working three days per week for a total of 26 hours per week" in her former job with Goodwill); Tr. at 23 (referring to Plaintiff's work activity after her AOD as "part-time"). The ALJ's misuse of the term "substantial gainful activity" with respect to the jobs of companion and store laborer was harmless in that it was remedied by his specific references to the amount of time Plaintiff worked each week and her earnings in these positions.

Plaintiff argues her November 2020 MRI of the lumbar spine suggests she could not perform work at the medium exertional level and postulates that if the state agency consultants had reviewed that MRI, they would have assessed an RFC for light work. Plaintiff's argument is speculative, as it is impossible to know what the state agency consultants would have concluded had they reviewed the record after the MRI results were included. However, the ALJ specifically cited the MRI results, noting:

> In November 2020, imaging of the lumbar spine showed moderate to advanced degenerative disc disease at multiple lumbar and lower thoracic disc levels, mild to moderate dextroscoliosis of the thoracolumbar spine, disc bulges and

herniations at L3–L4, L4–L5, and L5–S1, lateral recess and foraminal stenosis, and mild canal stenosis (11F/1–2).

Tr. at 19. He considered "unpersuasive" the state agency consultants' opinions that Plaintiff did not have a severe physical impairment and found DDD severe based on the imaging. Thus, he acknowledged that the state agency consultants likely would have found Plaintiff's physical impairments severe and assessed functional limitations if they had access to the MRI report.

However, the ALJ specifically rejected and provided a lengthy explanation for declining to accept Plaintiff's allegations of greater functional limitations, including for less than medium work. After discussing the opinion evidence, he further explained:

> The claimant's imaging and BMI support the finding that her degenerative disc disease and obesity are severe, however greater than limitation to medium work is not warranted as the claimant's physical examinations show normal gait, muscle tone, and sensation (11F/1–2; 25F/7). Greater limitation is also not warranted based on the claimant's ability to work part-time as a home healthcare aide and at Goodwill.

Tr. at 23. Thus, the ALJ specified that he relied on the objective evidence, physical exam findings, and Plaintiff's "part-time" work in finding she could perform work at the medium exertional level on a regular and continuing basis.

To the extent Plaintiff argues the ALJ erred in failing to order a consultative exam, as suggested by the state agency medical consultant, the

undersigned rejects this argument. The ALJ is only required to take additional action, including that of requesting a consultative exam, if the evidence is insufficient or inconsistent. *See* 20 C.F.R. § 404.1520b. The ALJ reasonably concluded the available evidence was neither inconsistent nor insufficient, as he referenced observations from comprehensive physical exams conducted after the state agency consultant reviewed the record. *See* Tr. at 19 (summarizing evidence from physical exams).

The ALJ stated he had considered the seven factors in 20 C.F.R. § 404.1529(c)(3) and SSR 16-3p in determining Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not generally consistent with the evidence. Tr. at 18. He explained:

> I find the claimant's allegations to be not consistent with the evidence for two main reasons. The first reason is the inconsistency between the claimant's allegations and the objective medical evidence discussed below. The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual. The claimant has been prescribed and has taken appropriate medications for the alleged impairments, which weighs in the claimant's favor, but the medical records reveal that the medications have been relatively effective in controlling the claimant's symptoms . . . . The claimant's physical and mental examinations demonstrate greater functioning than the claimant alleges. For example, physical examinations demonstrate normal strength on motor exam, normal reflexes, and normal sensation (16F/1; 24F/10). She had normal gait and station (22F/3, 6, 10; 24F/10; 25F/10). On a few occasions, she had reduced range of motion in the neck and lower back (21F/6; 22F/3) . . . . These findings provide support for the residual functional capacity conclusion in this decision. Overall, the claimant's allegations are not consistent with the

record taken as a whole, and the objective evidence in the record does not support the claimant's allegations.

The second reason I find the claimant's allegations are not entirely consistent with the evidence is the claimant's many reportedly intact activities of daily living. The claimant has described daily activities, both in writing and at the hearing, that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. For example, the claimant reported she is able to handle personal care, cook, do laundry, go to the grocery store, and run errands. She reported she watched her son's four-year-old child from February to June. She stated she is able to do laundry, sweep, mop, take out the trash, dust, clean the bathroom and kitchen, perform yard work, pull wee[d]s, use a weed eater for short periods, drive, go to church, and go out to eat. In addition, the claimant reported she has been working 12–18 hours per week as a companion for elderly people, earning $13.00 per hour. The claimant stated that she prepares meals, handles medication, and helps with cleaning (Hearing Testimony). During the relevant period, the claimant also worked for Goodwill Industries pricing items and placing them on the floor. She stated she was working three days per week for a total of 26 hours per week . . . .

Tr. at 18–19.

The explanation above indicates the ALJ relied on the type of treatment Plaintiff received, her positive response to medications, physical exam findings, her ADLs, and her work activity, including the specific functions she performed in her jobs, in rejecting her allegations of greater functional limitations, including those for less than medium work.

The ALJ's decision reflects his consideration of the entire record, his resolution of conflicts between Plaintiff's allegations and the other evidence, and his well-reasoned explanation linking the evidence and his conclusion

that Plaintiff had the RFC to perform work at the medium exertional level. Therefore, substantial evidence supports the ALJ's RFC assessment.

III.   Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

October 2, 2023                                         Shiva V. Hodges
Columbia, South Carolina                     United States Magistrate Judge